William Francis SMITH, Respondent,

v.

Thanom P. SMITH, Appellant.

No. 28462.

Missouri Court of Appeals,
Kansas City District.

Nov. 29, 1976.

Motion for Rehearing and/or Transfer
Denied Dec. 23, 1976.

J. Kirk Rahm, Hensley, Rahm & Rahm,
Warrensburg, Gregory D. O'Shea, Lemay,
for appellant.

C. B. Fitzgerald, Warrensburg, for re-
spondent.

Before TURNAGE, P. J., and WEL-
BORN and HIGGINS, Special Judges.

ANDREW JACKSON HIGGINS, Special
Judge.

Appeal from adverse ruling on motion to
modify dissolution decree with respect to
custody of children. The question is wheth-
er Thanom P. Smith "was entitled to custo-
dy of the children as a matter of law."
Affirmed.

On November 12, 1974, William Francis
Smith filed his petition for dissolution and

alleged: That he and Thanom P. Smith were married August 31, 1966, in Thailand and were separated November 4, 1974; that he was residing at Whiteman Air Force Base and she was residing in Festus, Missouri; that the marriage was irretrievably broken; that Herbert William, age 6, Cheryl Lynn, age 5, and Terri Katherine, age 3, were children of the marriage and were in the "actual custody" of William Francis Smith. He prayed, among other things, for a decree of dissolution of the marriage and for custody of the children.

There is no question with respect to the service obtained upon Thanom P. Smith, and she filed no responsive pleading.

On December 31, 1974, the petition came on for hearing with Thanom P. Smith in default. The petition was supported in all respects by the testimony of William Francis Smith.

The court found the marriage was irretrievably broken, and that William Francis Smith was "the proper person to have care and custody of the three minor children" and the clerk was "directed to forward a ten day letter" to Thanom P. Smith advising her that "absent objection from said party being filed within ten days after date of mailing that a finding the marriage is irretrievably broken and an order of dissolution of the marriage may be entered of record." See Section 452.320, RSMo 1969.

There is no question with respect to receipt of this notice by Thanom P. Smith.

On January 13, 1975, the court decreed the indicated dissolution and awarded custody of the children to William Francis Smith, all in accordance with the findings of December 31, 1974.

On June 4, 1975, Thanom P. Smith filed her motion to modify the decree and alleged: That on the date the decree was entered, December 31, 1974, and on the date it became final, January 10, 1975, "actual custody of said minor children * * * was not in said William Francis Smith and was actually in Thanom P. Smith"; that the case proceeded to hearing by default;

that she is a native of Thailand, her ability to read and to understand English is limited, she was unaware of this country's customs and did not understand the implications of the papers and proceedings against her and the necessity to seek an attorney; that the order of custody was "improperly given because the information furnished to the Court by Petitioner relating to custody was untrue and improper"; that the best interests of the children would be served if they were with their natural mother; that the father has remarried, the children do not know the stepmother, and the circumstances are not in the best interests of the children under such conditions.

On August 18, 1975, the motion to modify was heard.

Thanom P. Smith, age 33, a Thai, was living with her ex-husband's parents in Festus, Missouri, and was working as a cleaning lady earning $125 per month. She did not speak English at the time of her marriage August 31, 1955, in Thailand to William Francis Smith. She denied telling her husband she wanted to return to Thailand, and stated she did not want to return to Thailand although her husband had tried to get her to return. She desired to have the children and denied telling her husband she did not want them.

Herbert Wilson Smith, age 50, father of William Francis Smith, lived in Festus, Missouri. He was employed five days a week, 7:00 a. m. to 4:00 p. m., as a greens superintendent at a golf course in Herculaneum, Missouri, and earned $8400 per year. His wife was employed six days a week, 6:30 a. m. to 12:00 noon, as a bakery clerk and earned $5000 per year. They lived in a "five room house, three bedrooms, living room, kitchen, and bathroom, and basement." During the time Thanom and the children were there, he and his wife occupied one bedroom, their 19-year old son occupied another, the three children the third, and Thanom slept on a daybed in the living room. He had known Thanom since 1968, and she had lived in the Festus home since November 4, 1974. Thanom's work was in

the evenings, four hours on Mondays and three hours on Saturdays. She was also going to Jefferson College three hours an evening on Tuesdays and Thursdays. Thanom had also lived in the Festus home for the year 1969, and from Fall, 1971, to Summer, 1973, and was welcome to continue living in the Festus home with or without the children. Thanom and the children were brought to the Festus home November 4, 1974, by her husband, his mother, and his friend. The children were enrolled in Festus schools November 6, 1974. The children remained in the Festus home until April 27, 1975, when Terri left with her father, and May 29, 1975, when the other two went with their father upon writ of habeas corpus issued by the court of appeals in St. Louis pursuant to the custody decree. His son filed an earlier divorce proceeding in Texas, which was dismissed because "his wife obtained a lawyer in Festus, to contact his lawyer in Texas * * *." The present divorce papers were brought to the Festus home and delivered to Frances Katherine Smith, mother of William Francis Smith. Mr. Smith (Herbert) read the papers to Thanom. He told Thanom her husband was trying to take the children; he did not advise her she needed an attorney "by my wife's request." He talked to his son December 24, 1974, in Festus, and his son advised that he (William Francis Smith) would have actual and legal custody of the children and that they would be left in Festus. Mr. Smith was aware of the receipt of the statutory notice of the decree of dissolution and called the Clerk of the Johnson County Circuit Court December 31, 1974. He learned that the proposed decree would vest custody of the children in William Francis Smith, and he communicated such knowledge to Thanom.

Frances Katherine Smith, age 48, mother of William Francis Smith, corroborated the testimony of her husband and Thanom. She went to Whiteman to talk to her son November 3, 1974, when Thanom called and said "Bill was going to kill himself." She talked to her son about a divorce and "told him that he couldn't have the children be-cause of the way he lived his life, and that he could make his Father and I Guardians over the children." That was agreeable to him, but later "he said * * * Mr. Fitzgerald [his lawyer] told him that he could not make us Guardians; that either he got the children or she got the children. * * He said she definitely would not get custody of the children * * * because he did not want to have to pay support money to her. * * * later on I told him that I was going to let him get custody of the children by default, because that's the way he wanted to get the divorce." She received the divorce papers; she did not advise Thanom to get a lawyer.

Movant also adduced testimony from Mrs. Martha Brown, Mrs. Marie Chevalier, and Mrs. Henrietta Bernier, neighbors of Thanom when she lived with her husband at Whiteman, that she was a good mother and housekeeper.

William Francis Smith, a 12-year career Air Force Staff Sergeant, described the events of early November, 1974. " * * * my Mother had come down on the 3rd, and said to me that Thanom had called her and said I was going to kill myself, which I hadn't, and I immediately got mad and jumped Noy about it, my former wife. I asked her what she meant by doing such a thing, then my Mother said that she had come to take the children away from me, and if she needed to do so she would get the police. I said, 'no, you are not taking the children.' I said, 'you can take Noy if you want to, but the children stay with me.' So, we talked about it during the day, and that evening I consented to let the children go stay with her until the divorce was final; at her request." He had talked with his wife about the divorce and "She said this was all right as long as they stayed with my folks until the divorce was over with, and that she would stay there with them and return to Thailand as soon as possible. * * She wanted to stay here for awhile and then, on the periods of time that I would go home, she would ask me if I had a thousand dollars so she could go back to Thailand."

On November 4, he helped deliver Thanom and the children to his parents' home in Festus. "* * * my Mother asked me to leave them there until the divorce was over with. And on the 8th of December * * she had called and asked if I would bring the beds up for the kids, so I took three beds up there for the kids to sleep on. * * And, I asked if they needed anything. They said no, everything was fine, just go ahead get your divorce final and get custody of the children and have it over with." His wife understood the "same thing." He knew she understood because "I speak Thai fluently, and I also talked to her in English and Thai, so she knew what I was coming to Court for. She knew that I was filing for custody of the children." He agreed and everyone understood that the children should be entered in the Festus schools "until the divorce was over with, and I would come back and get them. * * * [In] December, after the divorce was final, I called and said I was going to come and get the children, and my Mother had asked me to leave them there until school was out; everything was fine, they didn't need anything, or want anything, just bring up groceries when I come up there every once in a while." He visited his children in his parents' home on at least three occasions prior to taking Terri back to his home at Whiteman. "* * * the Base Commander had called my Commander at the hospital telling me that I either had to have dependents living in the house, or move out, and a possibility of losing a stripe and being fined." He remarried May 2, 1975, and his new wife, Lenexa, is employed at Central State University in Warrensburg. The children were enrolled in schools at Whiteman on August 26, 1976, and the bus takes them to school at 8:30 each morning. A baby sitter in Knobnoster, Mrs. Clear, cares for Terri during the day. His parents and Thanom visited the children in the home at Whiteman twice before the hearing on the motion. There were no problems except the children did not want to go with them. He admitted that he testified at the hearing on his petition for dissolution that the children were in his home at Whiteman and going to school there when they actually were in Festus. He did so because "there was an understanding between myself and my folks that the children would just be up there until the divorce was final, and I was to come back here, go up and get them. Q. So, you told Judge Russell something that wasn't true so he would give you illegal custody of the children? A. I didn't tell him that for this reason; no. Q. What was the reason? A. They was no specific reason to. I was asked a question and I answered it the best way I felt. * * * Q. You testified * * * that you had the care and custody of the children on December 31st, 1974. That wasn't true, was it? A. No, but I had taken them to my parents' house at their request, and I still felt that I had custody of the children. They were taking care of them through my permission. Q. All right. You didn't tell Judge Russell that you didn't have—actually have custody, that your parents were holding the custody— A. Physical custody; no, I did not have physical custody. Q. * * * In fact, the children were with their Mother, weren't they? A. They were. Q. You didn't tell Mr. Fitzgerald about that, though, did you? A. I wasn't asked. Q. You didn't think Mr. Fitzgerald would need to know that? A. * * * I explained it to him before we come into Court. Q. What did you explain to him? A. That the children were with their Mother. Q. And you told the Court that they were—that you had their care and custody? A. I told the court that I had the care and custody, yes, because I felt that I did have the custody even though they were with my parents." With respect to the incorrect testimony at the dissolution hearing, the following occurred: "Q. [By the Court]: Are you telling me that when you were in here in December of last year, and you told me that these kids were going to school in—at Whiteman Air Force Base, that you didn't understand what was being asked of you? I can understand how you might be mixed up on custody, but I have some difficulty in understanding how it is that you told me

that the kids were going to school at Whiteman Air Base, when they were going to school in Festus. A. They had been enrolled out here, and it was my understanding with my parents that I was just to take them up there temporarily and then bring them back here as soon as the divorce was final."

In the present home, Herbert has his own room, and Cheryl and Terri share a bedroom, separate and apart from the parents' bedroom.

Lenexa Ann Smith is a secretary at Central Missouri State University, and has two years of college education. She gets along well with the children, and without solicitation, they call her "Mother." She described the baby sitter, Mrs. Clear, as a nice woman who loves children.

Mrs. Wilma McKeon, Lenexa's mother, tutored the children to help them with English, and felt that her daughter got along well with the children.

Mary Elizabeth Weekly felt that Lenexa was fond of her stepchildren and that she and the children got along well.

Carolyn Flanagan, counselor in the school system, stated that the children were doing "quite well." Cheryl's test scores had been "a little below average" due to her "bilingual background." Cheryl seemed happy with her "new mother," and Herbert seemed to be satisfied with his new location "because he had a room all to himself, and he had a place to ride his bike."

At the conclusion of the evidence the court took the matter under advisement, and made the observations and findings as follows:

"There hasn't been any evidence presented to the Court that either of the parties is unfit in anyway to have the custody of the children. There isn't any testimony that the children were not doing well when they were with Mrs. Smith in Festus. There isn't any indication that they are not doing well and adjusted where they are at the present time.

"You have got some various principals that are involved in the law that the chil-

dren of tender years normally should be with their Mother. * * * Mrs. Smith has a language problem and is not really in good shape to provide monetarily for the children. On the other hand, the Court, at the time that the custody was granted to the Petitioner, was not aware that the children were not in Johnson County, and that they were not with Mr. Smith. * * * in order to award a modification or a change in this case, there would have to be facts available to the Court which were not known at the time of the entry of the decree, or there would have to be a change in the conditions of the parties in some fashion.

" * * * Mrs. Smith didn't appear in this proceeding, and * * * she hasn't testified that she was unaware of what the proceeding was. Mr. and Mrs. Smith Sr., have so testified. You have the situation where she got an Attorney in the Texas proceeding, so she apparently knew something about what a divorce was about."

On October 3, 1974, the court entered the following order:

" * * * Mr. Smith is a Sergeant in the United States Air Force, and since the dissolution he has remarried and is living at Whiteman Air Force Base with the three children. Mrs. Smith, a native of Thailand, is living with Mr. Smith's parents in Festus, Missouri. Mrs. Smith is employed in Festus, and is presently attending school.

"The uncontroverted testimony at the [present] trial indicated that at the time of the action for dissolution, the children were in Mrs. Smith's custody and had been for a period of approximately two months. The children had been in the care of Mrs. Smith for almost all of their lives prior to that time. The children have experienced little difficulty, at any time, whether living with their mother, their father, or their grandparents, and are presently doing well.

"The dissolution was heard on December 31, 1974, and a ten day letter, notifying Mrs. Smith that the Decree would be entered, was sent to Mrs. Smith on December

31, 1974. No objections to the dissolution were filed by Mrs. Smith, and the dissolution was granted January 13, 1975. Mrs. Smith was not represented in the dissolution proceedings, and did not appear at the hearing.

"A prior divorce had been filed by Mr. Smith in Texas, while Mrs. Smith was residing with Mr. Smith's parents in Festus, Missouri, and in that proceeding Mrs. Smith obtained a lawyer to represent her.

"Mrs. Smith now contends that she was not aware that Mr. Smith was seeking custody of the children in this dissolution action. As a basis for her misunderstanding, she asserts that at the time the action was filed, and up until April 27th, 1975, the children were with her in Festus, Missouri. This is uncontroverted. She further cites her lack of understanding of the English language as a factor, even though the Petition specifically prayed that custody be placed with Mr. Smith.

"Mr. Smith testified he had an agreement with Mrs. Smith whereby she would go home to Thailand after the dissolution and he would assume custody of the children. Mrs. Smith denies such an agreement. Mr. Smith testified at the dissolution hearing on December 31, 1974, that the children were in his custody and were attending school at Whiteman Air Force Base. This testimony was not true, and Mr. Smith offered no reasonable explanation as to his lack of candor with the court.

"It does not appear to the Court that either of the parents are unfit, although neither is the Court overly impressed as to the responsibility and reliability of either parent. The mother's story to the Court that she was not aware of the significance of the dissolution proceeding does not ring true in the light of her having previously obtained a lawyer in a proceeding in Texas, and in light of her having given up one child previously in Thailand. Her command of the English Language is sufficient, in the Court's opinion, for her to have understood and appreciated the possibility of custody being placed in her husband since that was what was prayed for in the Petition.

"The Court finds that there was an agreement between the parties as to the placement of the children, and the Court finds that no fraud has been perpetrated. The Court finds no change of circumstances that would justify a change of custody in view of the fact that the children are doing well. The Motion to Modify is overruled."

Appellant contends she was entitled to custody of the minor children "as a matter of law because (1) the children are of tender years, (2) they have been with their mother most of their lives, (3) * * * appellant is a good mother, willing and able to care for said minor children, (4) because respondent obtained the right to legal custody of said children through intentional and fraudulent misrepresentations to the court in the original default dissolution hearing, and (5) because it would be in the best interest of said minor children for their natural mother * * * to have custody of them." In clarification of her contention, appellant asserts "the modification * * * is sought on the basis of facts that were unknown to the Court and which were concealed from the Court at the time of the prior decree. Specifically, the prior decree was based upon false testimony of the Respondent as to material and relevant facts."

The record has been stated at length because it demonstrates that the court gave due consideration to all the factors mentioned in appellant's contention.

■ The court, irrespective of what it described as the father's "lack of candor" with respect to the children's physical custody on December 31, 1974, found specifically that no fraud had been perpetrated on the court. Appellant has not demonstrated that the court could not have so found, and the record is sufficient to cause this court to defer to the trial court on that issue.

The court has recognized that the children are of tender years, have been with their mother most of the time, and that she is a good mother, willing and able to care for the children. The court also found, and the record supports the findings, that the

father is at least equally fit to exercise custody and care of the children, that he is presently exercising custody and care, and that the children are doing well in his custody. Again, the record is sufficient to cause this court to defer to the trial court on those findings.

■ The court recognized also that children of tender years normally should be with their mother. This is not conclusive, however, where there is a finding, evidentially supported, that the best interest and welfare of the children are served by a departure from application of the foregoing principle. *S. G. E. v. R. L. J.,* 527 S.W.2d 698, 703 (Mo.App.1975); *L. E. (S). v. J. A. E.,* 507 S.W.2d 681, 683, 684 (Mo.App.1974).

■ The force of the court's findings and its refusal of a change of custody of the children is that "the children are doing well," i. e., that their best interests and welfare are best served by their remaining in their father's custody. This predominating finding, *Northrup v. Sieve,* 517 S.W.2d 470 (Mo.App.1974), is amply supported by the evidence. If the present custody of the children were to be modified to suit the mother, the evidence shows that three young children would be raised primarily by their grandparents, in the grandparents' crowded home, as contrasted with the superior accommodations which the evidence shows are available in the father's home on Whiteman Air Force Base where he is a career noncommissioned officer. The evidence shows also that the children have adjusted well to the father's home and to his new wife, and that the two school-age children are doing well in their schooling. The youngest child is secure in the care of a competent baby sitter during working hours. These circumstances demonstrate that the court gave the required paramount consideration to the welfare of the children, and the record does not, as a matter of law, dictate a contrary result. *Noland v. Noland,* 527 S.W.2d 696 (Mo.App.1975).

Judgment affirmed.

All concur.